# ORIGINAL

HERBERT S. OLSON, IN PRO SE

P.O. BOX 815

FALLON, NV 89406

775-750-8704

dsonherb52@gmail.com

FILED ____ RECEIVED ____
ENTERED ____ SERVED ON ____
COUNSEL/PARTIES OF RECORD

MAY 24 2022

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY: _____ DEPUTY

Paid Amt $ 402 ᵒᵒ  Date  MAY 3 1 2022

MVRNO

Receipt # 5563  Initials

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA, RENO

HERBERT S. OLSON,

            Plaintiff,

VS.

STATE OF NEVADA, Nevada Department
of Public Safety, and Does 1-10

            Defendants,

CASE NO.: 3:22-cv-00232

Complaint: Title II of the Americans with
Disabilities Act of 1990 (ADA), Rehabilitation
Act of 1973 (RA), Section 504, and NRS:
484B.467

JURY TRIAL DEMANDED

The Plaintiff, HERBERT S. OLSON, In Pro Se, complains against the
Defendants, STATE OF NEVADA, NEVADA DEPARTMENT OF PUBLIC SAFETY,
(NDPS), and Does 1-10, inclusive, alleges and states as follows.

### JURISDICTION AND VENUE

1. This Court has jurisdiction of this action under Title II of

1.

the Americans with Disabilities Act, (ADA), 42 U.S.C. Section 12131- 12132, Section 504 of the Rehabilitation Act (RA), 29 U.S.C. Section 794 (a) and U.S.C. Section 1331 and 1345, and Nevada Revised Statute, NRS: 484B.467.

2. Venue is proper in the United States District Court, District of Nevada, Reno, under 28 U.S.C. Section 1391.

## II Parties

3. Plaintiff, HERBERT S. OLSON, In Pro Se

4. Defendants', STATE OF NEVADA, Department of Public Safety, (NDPS), Does 1-10. State of Nevada is a "Public Entity," within the meaning of the ADA, 42 U.S.C. Section 12131(1), 28 C.F.R. Section 35.104 and is therefore subject to Title II of the ADA. 42 U.S.C. Section 12131, et. seg.

5. At all times relevant to this action the State of Nevada, (NDPS), is a recipient of federal financial assistance including Medical funds, and is therefore subject to Section 504 of the R.A. 29 U.S.C. Section 794(a).

## III BACKGROUND

A. The Americans with Disabilities Act of 1990, Title II, Section 504 of the Rehabilitation Act of 1973, and NRS: 484B.467.

6. Congress enacted the ADA in 1990, to provide a clear and comprehensive view to national mandate to eliminate for discrimination against individuals with disabilities is discrimination. 42 U.S.C. Section 12101(b)(i), to isolate and segregate individuals with disabilities is discrimination. 42 U.S.C Section 12101(a)(2).

7. "[No]" qualified individual with a disability shall reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a "Public Entity" or subject

2.

to discrimination by any such entity. 42 U.S.C. Section 12133, 12134. See Also, 28 C.F.R. Section 35.130(a), 35.152(b)(2).

8. Congress directed the Attorney General to issue regulations implementing Title II of the ADA. 42 U.S.C. Section 12134.

9. Title II regulations, Required public entities to administer services, programs and activities in the most intergraded setting appropriate to meet the needs of "qualified individuals with a disability, 28 C.F.R. Section 35.130(d).

10. Discrimination on the basis of disability is also prohibited by Section 504 of the RA. 29 U.S.C. Section 794(a).

11. The Rehabilitation Act, implementing regulations provide that Recipients of "federal financial assistance" shall administer programs, and activities In the most intergraded setting appropriate to the needs of qualified individual with a disability. 28 C.F.R. Section 41.51(d), 45 C.F.R. Section 84.4.

## IV  INTRODUCTION

12. Plaintiff, HERBERT S. OLSON, has been involved with fighting for equal access for the disabled since 1987. Plaintiff first started filing complaints under the Civil Rights Act of 1964, and the Rehabilitation Act of 1973. In 1990 the Plaintiff filed his first complaint under the Americans with Disabilities Act of 1990.

13. Plaintiff has filed over 300 complaints here in Nevada with the U.S. Department of Justice (DOJ), over the last 36 years. Plaintiff started filing complaints in Elko, Nevada on public entities and public accommodations with DOJ under Title II and III of the ADA. DOJ sent attorney Thomas Contois to Elko to do an onsite investigation

3.

in Elko, Nevada.

14. Attorney Thomas Contas investigated complaints filed by the Plaintiff in Elko, Nevada. Newmont Gold Mine, Barrick Gold Mine, casinos, schools, public entities like City Hall, Courthouse, County Library, Fairgrounds, Nevada Department of Wildlife, Employment Office, Nevada Highway Patrol and the Nevada Department of Transportation.

15. Plaintiff and a good friend started a business in Elko. The business dealt with handicap parking spaces. They would paint in the parking spaces, and access aisle. They would install the signs needed at each space. Plaintiff sold his half of the business and started a business in Reno, Nevada.

16. Plaintiff started his ADA Consultant and Building Inspector business in Reno, Nevada on July 26, 1990. See; Exhibit A

17. Plaintiff in 1990 was attending school at the University of Nevada, Reno, (UNR) in a dual degree program in art and civil engineering. At this time the Plaintiff was a member of the Disabled Persons Advisory Committee at UNR over handicap parking, signage and wheelchair ramps. During the same time the Plaintiff was a member of the Disabled Persons Advisory Committee for the City of Reno over sidewalks, curb ramps and signage for the disabled.

18. Plaintiff did file multiple complaints against the University of Nevada, Reno, (UNR), and the City of Reno for violating Title II of the Americans with Disabilities Act, (ADA) and Section 504 of the Rehabilitation Act. (RA).

19. Plaintiff later transferred to the University of Nevada, Las Vegas, (UNLV) in 1992 to finish his education. Plaintiff graduated from UNLV in 1996.

20. Plaintiff then started working as an ADA consultant in Northern California.

4.

21.   President George Herbert Walker Bush signed into law the Americans with Disabilities Act of 1990, on July 26, 1990 to ensure equal Rights protection for disabled individuals for not being excluded from participation in, or be denied the benefits of services, programs or activities of a public entity, or be subjected to discrimination by any such entity. 42. U.S.C. Section 12132, 28 C.F.R. Section 35.130(a).

22.   Plaintiff started his employment for the Americans with Disabilities Act Advocates as an ADA consultant and expert witness with George S. Louie in 2002. Plaintiff's position as an ADA consultant was to preform onsite investigations and take pictures of the violations. Most all of the Complaints were on large corporations in Northern California. Plaintiff's employment as an ADA consultant ended in 2005. Plaintiff decided to move back to Fallon for personal reasons. see (Exhibit A)

23.   Plaintiff has self-Represented himself in the United States District Courts, Northern District of California, San Francisco, Oakland and Eastern District Court, Sacramento and here in United States District Court, District of Nevada, Reno

24.   Plaintiff has also filed meritorious complaints with the United States District Courts and the United States Department of Justice.

## V FACTUAL EVIDENCE

25.   Plaintiff, HERBERT S. OLSON, is a natural citizen of the United States, Resides in Carson City, Nevada, in this jurisdiction. Plaintiff is also a "qualified individual with a disability," as the term defined in 42 U.S.C Section 12131 (2).

26.   For the incoming facts in the cause of action; the following material facts must be brought forth because this is the reason that led to the

Plaintiff discovery of the Title II vidations of the ADA, at the State of Nevada, Nevada Depart. of Public Safety, Adult Parole and Probation Office at 145 Keddie Street, Fallon, Nevada. Plaintiff first went to the Adult Parole and Probation Division was before trial. Judge Richard Wagner ordered the Plaintiff to get a back ground check before trial at the District Court, Humboldt County, Nevada in case No. CV20-463.

26. On March 22, 2012, various law enforcement agencies from around Humboldt County, Nevada. The Nevada Department of Public Safety, (NDPS), Tri-County Narcotic Task Team were conducting temporary WCI Drug Checkpoints, ("an illegal highway hoax (RUSE)," at the Mote Exit 222 off I-80 in Humboldt County at the bottom of the off ramp headed east.

27. Plaintiff was traveling east bound on I-80 and took the Mote Exit 222. His dog Buddy had to Release himself. Buddy alerted the Plaintiff by getting excited and barked once letting the Plaintiff know that he needed to take care of business. Plaintiff exited the off ramp. Plaintiff just seen a sign that stated, "one mile drug checkpoint." Plaintiff knows you can drive around a checkpoint if you don't break any laws. Just as he drove onto the off ramp, he could see a sheriff vehicle parked at the bottom of the ramp on the east side of the access Road, straight across from the stop sign. Directly behind the Sheriff's vehicle about 50 yards was a unmarked black Dodge Charger parked in the then around area.

28. Plaintiff seen two tractor trailers parked on the right side of the off ramp. The first one at the bottom of the ramp was completely all white and the one behind it was all Red. Both of them pulled out and left during the time Plaintiff was being arrested and none of the officers can Remember the two tractor trailers that were directly behind the "STOP" sign parked on the side of the off ramp.

29. As the Plaintiff pulled up to the cattle guard he stopped for the "STOP" sign. Plaintiff started moving slowly as he crossed over the cattle guard. He then drove across the access road and parked on the east side. Plaintiff let his dog Buddy out to go releave himself. Once he opened the drivers door, Buddy jumped over his lap and started doing what male dogs do in marking his territory.

30. Sheriff Deputy Levi walked up to the Plaintiff standing outside his vehicle and asked for his drivers license and insurance. Plaintiff handed Deputy Levi what he requested. Once Deputy Levi returned to the Plaintiff he did not give him the reason he was stopped. Plaintiff never received a warning ticket or terrific ticket.

31. Deputy Levi returned and Detective Rochester was talking to the Plaintiff standing in the door opening area. Deputy Levi handed the drivers license and insurance papers to the Plaintiff and moved out of the way for Detective Rochester.

32. Detective Rochester approached the Plaintiff standing in the open door on drivers side of the car. Detective Rochester told the Plaintiff he could smell marijuana and asked if he'd been smoking. Plaintiff told him that he hadn't been smoking marijuana. Detective Rochester never had the Plaintiff drug tested after claiming to smell marijuana. Detective Rochester used the smelling of marijuana on the Plaintiff in asking to search the car. Plaintiff told Detective Rochester "NO" you cannot search the car.

33. If Detective Rochester could smell marijuana on the Plaintiff. Why didn't he drug test the Plaintiff if it was a real drug checkpoint. This makes absolutely no sense if this was a legal drug checkpoint and the Detective could smell marijuana. Detective Rochester told him to use the dog and search the vehicle without consent from the Plaintiff.

7.

34. The K-9 Unit showed up and they had the dog start smelling around the outside of the vehicle. Plaintiff's dog Buddy returns after seeing the dog by the vehicle. Buddy was a six (6) year old male and not fixed. The K-9 dog was around two (2) years old and a female. Plaintiff is positive the K-9 dog could smell Buddy and reacted as she smelled the outside of the vehicle. The K-9 Unit Officer told the Plaintiff to put his dog in the Sheriff patrol vehicle. The two dogs were paying more attention to each others than searching the vehicle. Plaintiff told his dog Buddy to get in the patrol vehicle.

35. They let the K-9 dog search the vehicle. Plaintiff's vehicle was searched without his consent. Plaintiff's vehicle was illegally searched and the officers discovered a green cloth cooler with two (2) gallon plastic jars inside the cooler. Inside each plastic one gallon jar were bags of marijuana. They found the marijuana on the floor in the front, passager side of the vehicle. Therefore, Detective John Dunkhorst of the NDPS Investigation Division, Tri-County Narcotic Task Team ordered Detective John Rochester to arrest the Plaintiff for possession of a controlled substance marijuana, possession of a control substance with the intent to sale and possession of a controlled substance for transport. Detective Dunkhorst further told Deputy Levi and Detective Rochester to transport the Plaintiff to the Humbaldt County Correctional Centre in Winemucca, Nevada.

36. Plaintiff was stopped and searched without any probable cause. Deputy Levi or Detective Rochester didn't tell the Plaintiff the reason he was stopped. Neither one of the officers issued the Plaintiff a warning ticket or a traffic ticket for "failing to yield to a STOP sign." They illegally searched the Plaintiff's vehicle without consent or did they have any probable cause to search the vehicle. They violated Plaintiff's fourth Amendment Constitutional Rights

8.

37. When the Plaintiff was being booked into jail. Detective Rochester told the female deputy not to charge the Plaintiff with a traffic ticket. Charge him with the three (3) felonies and set bail at $35,000.00 The Plaintiff knew right then that they have no probable cause without a warning or a ticket for the violation. Deputy Levi and Detective Rochester never told the Plaintiff the truth for being stopped and searched without consent.

38. During the time Deputy Levi and Detective Rochester were transporting the Plaintiff to the Humboldt County Correctional Center in Winnemucca, Nevada. Detective John Dunkhorst and Detective Orlando Gurrea drove to Fallon, Nevada, and without a search warrant searched 160 Timothy Way, the apartment of Lloyd F. Olson, father to the Plaintiff. They illegally entered the apartment once they found the front door unlocked, and searched it, violating Plaintiff's fourth Amendment Right, further, first at the the initial traffic stop at the I-80, Mote Exit-222.

39. Detective John Dunkhorst lied under oath on his affidavit for a search warrant for 160 Timothy Way. Detective Dunkhorst went into the apartment before writing his affidavit. Once he found the front door unlocked he decided to break in and search the apartment. They did find the two (2) glass gallon jars under the sink in the back bedroom. They had bags of marijuana in both of them. This alone proves he is guilty of breaking and entering once he wrote up his affidavit.

40. Mr. Olson returned home to find police officers in the garage and house searching through everything. They told him to sit down by the kitchen table. Plaintiff's father was very upset not knowing what was going on. One of the police officers set the Affidavit and Search Warrant down on the table without saying anything to Mr. Olson. After putting the papers on the table the officer left.

41. D.A. Arthur Malloey refused to charge Detective John Dunkhoest for illegally breaking into and searching Lloyd F. Olson's apartment and for lying under oath on his affidavit for the search warrant. Detective Dunkhoest violated the Plaintiff's fourth Amendment Constitutional Rights by searching, 160 Timothy Way. This is the second (2) time in one day the Plaintiff was searched without giving consent to search.

42. D. A. Arthur Malloey and D.A. Micheal MacDonald should be charged with Obstruction of Justice for refusing to charge Detective John Dunkhoest with perjury. Both of them should be arrested and sent to prison for what they did to the Plaintiff. Sending him to prison on two 4 year sentences running concurrent by covering up all the laws violated by Detective Dunkhoest.

43. While pending Plaintiff's trial, Humboldt County District Court Judge Richard Wagner ordered the Plaintiff to report to the State of Nevada, NDPS, Adult Parole and Probation Office at 145 Keddie Street, Fallon, Nevada for a background check before trial.

44. At Plaintiff's criminal trial on October 18, 2013, District Court Judge Richard Wagner permitted Plaintiff to represent himself with the assistance of public defender Steve Evenson. During said trial, Sheriff Deputy Levi and Detective Rochester testified at Plaintiff's preliminary hearing (PHT) transcripts and at trial. (trial transcripts/TT) Vol. I, II, III; ect.)

45. Both Deputy Levi and Detective Rochester claimed that Plaintiff claimed that Plaintiff failed to come to a complete "STOP" at the "STOP" sign (PHT pages 2, 14, 25, 27), trial transcripts (TT Vol. I pages 28, 29 39, 40, 70- 80 vol.II 110 to 116). Both offices futher testified that although the parole vehicle did have a "dash cam Recorder", on board, that the "dash cam Recorder" was not working that day. It randomly worked

one day and not the next. (PHT 4, 12, 25 and 27), (TT Vol. I 116, 118, 119) Both officers further testified that they could not remember if any tractor trailers were parked on the right side of the off ramp at Mote Exit 222. (PHT 4, 14, 25-27)(TT Vol. I 65-67, 116). Deputy Levi even further testified that Plaintiff was never charged by any law enforcement agency for a traffic violation, (TT Vol. II at 317, lins 5-7)

46 The Nevada Department of Public Safety conducted an investigation concerning the Tri-County Narcotic Task Team and on December 03, 2014, confirmed that their department has "[NO]" documents meeting the criteria of "Policy, Practice and Procedure" for conducting the MCI Drug Checkpoints on I-80, at the Mote Exit 222, in Humboldt County, Nevada.

47. The Nevada Department of Transportation, (NDOT), also confirmed that they did not get involved with the MCI Drug Checkpoints, and the same was confirmed by the Nevada Department of Highway Patrol Law Enforcement Division. The Lander County Sheriff Department and the Humboldt County Sheriff Department confirmed that they had "NO" Policy, practice and procedure for putting up MCI Drug Checkpoints on I-80, in Humboldt County, Nevada.

48. Plaintiff, HERBERT S. DYSON was sent to prison by his own public defender Steve Evenson. Plaintiff sent Mr. Evenson an email on April 04, 2014. Mr. Evenson did not respond to the email. Mr. Evenson took the email over to Judge Richard Wagner's house that Friday night. They contacted assistant D.A. Richard Haas and had their meeting over the email the Plaintiff sent his attorney public defender Steve Evenson. Thinking that the email was confidential between attorney

client. During their meeting they decided the email was a threat. Mr. Steve Evenson never contacted his client Herbert S. Olson telling him about what he did with the email. Plaintiff was sentenced the following Monday, April 07, 2014. Public Defender Steve Evenson went behind his clients back without his knowledge and held court at Judge Richard Wagner's house and D.A. Haas on April 04, 2014, and found the Plaintiff guilty of making threats in the email.

49. Judge Richard Wagner sentenced the Plaintiff on April 07, 2014, to the Nevada State Prison, Northern Nevada Correctional Center, (NNCC), on two (2) four (4) year sentences running concurrent.

50. After the Plaintiff served three hundred and sixty two days (362) incarcerated at the Northern Nevada Correctional Center. Plaintiff, was released from prison and once again on April 04, 2015, he reported to the State of Nevada, Department of Public Safety, (NDPS), Adult Parole and Probation Division Office at 143 Keddie Street, Fallon, Nevada where he further confirmed that said facility was not in compliance with Title II of the ADA, and explained those facts to his parole officer on April 04, 2015. His Parole officer, who thereafter, said his parole officers will visit his home once a month in Fallon. Plaintiff was honorably discharged by Parol and Probation from parole.

51. The ADA applies to the State of Nevada because it is a "Public Entity" as defined by Title II of the ADA. 42 U.S.C. Section 12131(1). Title II prohibits discrimination against qualified individuals with a disability on the basis of disability in the services, programs or activities of a "Public Entity." 42 U.S.C. Section 12132.

52. [NO] qualified individual with a disability, shall, reason of such disability, be excluded from participation in or be denied the

12.

benifits of the services, programs or activities of a public entity, or be subject to discrimination by any such entity. 42 U.S.C. Section 12132.

53. "Qualified Individual with a Disability" means an individual with a disability, who with, or without reasonable modifications to policies, practices or procedures, to removal of architectual, communication, or transportation barrier, or the provision of auxilary aids, and services meets the essential eligibility requirements for the recipt of services, or participation in programs or activities provided by the public entity. 42 U.S.C. Section 12131(2), see also, 28 C.F.R Section 35.108.

54. The Department of Justice's revised Regulations for Title II of the Americans with Disabilities Act of 1990, (ADA), were published in the Federal Register on September 15, 2010. Those Regulations adopted Revised enforceable accessibility standards called the "2010 Standards for Accessible Design," 2010 Standards. On March 15, 2012, compliance with the 2010 standards was Required for new construction and alteration under Title II and III, March 15, 2012, is also the compliance date for using the 2010 standards for programs accessibility and barrier Removal.

## III  STATE OF NEVADA

A. Plaintiff, HERBERT S. OLSON submits a list of Title II of the ADA, violations and the violations of NRS: 4848.467, at the State of Nevada, Nevada Department of Public Safety, Adult Parole and Probation Division Office at 145 Keddie Street, Fallon, Nevada  89406

13.

1. Section 36.403 Alterations; Path of Travel

(a) A "Path of Travel" includes a continuous unobstructed way of pedistrian passage by means of which the altered area, may be approached, entered and exited, and which connects the altered area with an exterior approach (including sidewalks, streets and parking areas.), an entrance to the facility and other parts of the facility.

(b) An accessible "path of travel" may consist of walks, sidewalks, curb ramps and other interior and exterior Rooms and other improved areas, parking access aisles, elevators and lifts, or a combination of these elements.

2. Section 502, Handicap Parking. 2010 Standards, ADA Compliance

(a) 502.2 Vehicle Spaces; Car parking spaces shall be 96 inches (2440mm) wide minimum and van parking shall be 132 inches (3350mm) wide minimum shall be marked to define the width, and shall have an adjacent access aisle complying with Section 502.3, Access Aisle; (1) 60 inches minimum, (2) Van accessible 96 inches minimum. Figure 502.2, Parking Spaces.

EXCEPTION: Van parking shall be permitted to be 96 inches wide minimum, where the access aisle is 96" inches wide minimum.

(b.) 502.4; Floor or Ground Surfaces, Parking spaces and access aisles serving them shall comply with Section 302, Access aisle should be at the same level as the parking spaces they serve. Changes in level "NOT" permitted Figure 9, Dimensions of Parking Spaces.); complying with 4.1.2(5)(6).

(c.) 502.6; Parking Spaces identification signs shall include the International Symbol of Accessibility complying with Section 703.7.2. Signs indentifing "van accessible", parking spaces shall contain the designation "van accessible". Sign shall be 60 inches minimum above the finished

14

ground surface measured to the bottom edge of the sign. (S.H. 4.6.4)

(D.) Section 502.3.3 of the 2010 Standards requires that access aisle be so as discourage parking in them.

(E) Section 208.2.4; 2010 Standards, Van accessible parking spaces. For every six (6) or fraction of six parking spaces required by Section 208.2 to comply with Section 502, at least one shall be van accessible parking space complying with Section 502.

(F) Van accessible parking spaces, The 1991 Standards at Section 4.1.2(5)(b), 4.6.3, 4.6.4, and 4.6.5 are still the same in the 2010 Standards Section 4.6.3: Parking Spaces, 4.6.4, Signage

3. State of Nevada, Nev. Rev. Stat. Section 484.408 (2013) [Replaced in revision by NRS: 484B.467]

(a.) NRS: 484B.467, Parking Spaces designed for persons with a handicap. At all van accessible aisles must be indicated by a sign (a), (b), (c). The bottom of which must be not less than 48 inches above ground. See, Section 502.6, 60 inches above ground.

4. Section 642, Sidewalk Design Criteria

(a). Sidewalks or pedestrian paths will be accessible to the maximum extent feasible to all people according to the Americans with Disabilities Act of 1990.

(b) Section 642.8.1, Sidewalk location and width, sidewalks are to be at least 60 inches wide. However if nessecary due to geometric constraints, the with of the sidewalk may be reduced to 48 inches minimum width as required in PROWAG, by completing the Design Exception Process. However, the ADA requires a minimum width of 48 inches in all cases. (PROWAG R301.3.1)

5.) Section 642.8.6; Landings.

(a) Landings are level areas built to provide pedestrians with a place to rest or make turning maneuvers, or where it is necessary to have a level, stable area to allow access to another feature such as pedestrian push button. The slope of the landing should allow for drainage and be designed and built with a minimum 1% slope and may not exceed a slope of 2% in any direction. The landing must extend out 5 ft minimum from the door. Landing should be the minimum of 5ft x 5ft.

6.) Section 406.4; Landings, Curb Ramps,

(a) Landings shall be provided at the top of curb ramps. The landing clear length shall be 36 inches minimum. The landing clear width shall be at least as wide as the curb ramp, excluding flared sides, leading to the landing.

7.) Section 705; Detectable Warnings,

(a) Detectable Warnings shall consist of a surface of truncated domes and shall comply with 705.

8.) Section 216, Signs;

(a.) 216.2, Designations Interior and exterior signs identifying permanent room and spaces shall comply with 703.1, 703.2, and 703.5.

(b.) 216.3, Directional and International Signs, that provide direction to or information about interior spaces and facilities of the site shall comply with 703.1 and 703.2.

(c.) 216.4, Means of Egress, Sign for means of egress shall comply with 216.4, and 216.4.1. Exit doors at exit passage ways, exit discharge, and exit stairway shall be identified by tactile signs complying with 703.1, 703.2 and 216.5. Parking spaces complying with 502 shall be identified by signs complying with 502.6.

9.) N.R.S. 484B.467; Handicap parking space designed for persons who are handicapped: Signs; required plates, stickers or placard for parking.

16.

(i) Any parking space designed for persons who are handicapped must be indicated by a sign.

(a) Bearing the International symbol of access with or without the words "Parking," "Handicap Parking", "Handicap Parking Only", or "Reserved for the Handicapped," or any other word or combination of words indicating that the space is designated for persons who are handicapped.

(b.) Stating minimum fine of $250.00 for use by others or equivalent words; and

(c.) The bottom of which must be not less than 4feet above the ground.

3. If a parking space is designed for the use of a vehicle with a side loading wheelchair lift, the space which is immediately adjacent and intended for use in the loading and unloading of a wheelchair into or out of such a vehicle must be indicated by a sign:

(a.) Stating "NO Parking" or similar words which indicate that parking in such a space is prohibited.

(b.) Stating "Minimum Fine of $250 for violations" or similar words indicating that the minimum fine for parking in such a space is $250 fine and;

(c.) The bottom of which must be not less than 4feet above the ground. (Exhibit 8)

NOTE: There are over 400 thousand van accessible parking spaces in Nevada and less than 1% are in compliance with NRS: 4818.467.

17.

COUNT ONE

Title II of the Americans with Disabilities Act of 1990

1. Title II of the Americans with Disabilities Act requires that "no qualified individual with a disability, such by reason of such disability be excluding from participation in, or be denied the benefits of the services, programs or activities of a "public entity," or be subjected to discrimination by and such entity. 42 U.S.C. Section 12132. 28 C.F.R. Section 35.130(a).

2. Title II of the ADA requires a public entity to make the reasonable modification in policies, practices and procedures when the modifications are necessary to avoid discrimination on the basis of the disability, unless the public entity demonstrates that accomplishing the modifications would fundamentally alter the nature of the services, programs or activities. 28 C.F.R. Section 35.130(b)(7)(i).

3. Additionally under Title II of the ADA, a public entity may not, directly or through constructual or other arrangements utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on basis of disability. 28 C.F.R. Section 35.130(b)(3)(i).

4. The State of Nevada, Nevada Department of Public Safety, (NDPS), within the meaning of the Americans with Disabilities Act of 1990, 42 U.S.C. Section 12131(1), and 28 C.F.R. Section 35.104 and therefore, subject to Title II of the Americans with Disabilities Act, and it's implementing regulations.

COUNT TWO

18.

REHABILATION ACT OF 1973, SECTION 504

1. Section 504 of the Rehabilation Act of 1973, Pub.L. No. 93-112, 87 Stat. 394, codified at 29 U.S.C. Section 701 et. seq., is American legislation that guaranties certain Rights to people with disabilities. It was one of the first U.S. Federal Civil Rights Laws offering protection for people with disabilities.

2. Section 504 states that No qualified individual with a disability, in the United States shall be excluded from denial of benfits of or be subjected to discrimination under any services, programs or activities that either receives federal finanical assistance

RELATIONSHIP BETWEEN THE ADA AND SECTION 504, RA

1. Section 504 laid the groundwork for the development of Title II of the ADA, as Congress stated that the purpose of Title II was to make applicable the prohibition against discrimination on the basis of disability, currently set out in Regulations implementing Section 504 of the Rehabilation Act of 1973, to all services, programs and activities provided or made available by state and local gouvernments, or instrumentalities or agencies thereto, regardless or not such entities receive federal financial assistance.

COUNT THREE

STATE OF NEVADA, NEV. REV. STAT.; NRS: 484B.467

1. 2010 Nevada Code: Title 43 Public Safety, vehicles; watercraft

19.

Chapter 484 Traffic laws, N.R.S.: 484.408, Parking spaces designated for persons who are handicapped: Signs; Required plates, stickers or placard for parking, prohibited acts, penalty. NEV. REV. STAT. Section 484.408, 2013; Replaced in Revision by NRS: 484 B.467, Handicapped Parking; Signs.

### PRAYER FOR RELIEF

1. Plaintiff, HERBERT S. OLSON demands a trial by jury

2. Plaintiff hereby request for one million ($ 1,000,000) dollars against the defendants.

3. For damages according to proof;

4. For the court cost of the complaint;

5. To enjoin defendants for failing or refusing to operate the State of Nevada, Department of Public Safety, Adult Parole and Probation Division Office in a manner that complies with Title II of the Americans with Disabilities Act of 1990.

6. This court enjoins and orders the defendants to alter its facility to make such accessible to and usable by "qualified individuals with a disability," to the extent required by Title II of the Americans with Disabilities Act of 1990.

7. Award compensatory damages to the Plaintiff, sufficient to fully compensate the Plaintiff for being denied equal access caused by the Defendants' discriminatory conduct at the State of Nevada, Nevada Department of Public Safety, Adult Parole and Probation Division Office, located at 145 Keddie Street, Fallon, Nevada 89406

8. Grant, Plaintiff HERBERT S. OLSON, all relief justice may require.

DATED THIS 23 DAY of MAY 2022

Respectively Submitted

Herbert S. Olson, In Pro Se
P.O. Box 815
Fallon, Nevada   89406
775-750-8704
olsonherb52@gmail.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*EXHIBIT*

*A*



OLSON

HERBERT S.

HANDICAP
ACCESS CONSULTANT
BUILDING INSPECTOR

LIC.#A71934
1990

702/673-5329 or 4627
P.O.BOX 9324, RENO, NV 89507



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT
B





